# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| | ) |
| A black 2018 Toyota RAV 4 sports utility vehicle with California License Plate Number 8CYV170, vehicle identification number 2T3ZFREV4JW424860 | ) |

Case No. 5:21-MJ-00161

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343; 1344; and 1028A | See attached affidavit |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

_____
*Applicant's signature*

Task Force Officer Donald R. Isaacs
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Riverside, CA

_____
*Judge's signature*

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Ruben D. Escalante

**<u>AFFIDAVIT</u>**

I, Donald R. Isaacs, being duly sworn, declare and state as follows:

## I.   <u>INTRODUCTION</u>

1.   I am a Federal Bureau of Investigation ("FBI") Task Force Officer with the Los Angeles Division, Palm Springs Resident Agency ("PSRA").  I have been employed by the Riverside County Sheriff's Department ("RCSD") since August 2006.

2.   I graduated from the RCSD's Basic Peace Officer Academy located in Riverside, California, in February 2007. Upon graduation I was assigned to the Palm Desert Sheriff's Station located in Palm Desert, California, where I worked field patrol operations and special enforcement details.

3.   In June 2014, I was promoted to Sheriff's Investigator and assigned to the Investigations Bureau of the Palm Desert Sheriff's Station, where I investigated financial crimes, elder abuse, violent crimes, and criminal street gang related crimes. In June 2019, I am currently assigned to the RCSD's Special Investigations Bureau – Major Crimes Unit, located in Riverside, California.  I am assigned to the FBI Desert Cities Safe Streets Task Force, Los Angeles Division, PSRA, located in Palm Springs, California.

4.   I have participated in numerous criminal investigations, including fraud, forgery, identity theft, financial elder abuse, embezzlement, and other theft crimes during my tenure as a Peace Officer.  I hold an Advanced Peace Officer's Certification from the California Commission on Peace

Officers Standards and Training ("POST").  Additionally, I hold a Robert Presley Institute of Criminal Investigation Homicide Investigation Certificate.  I have attended training related to fraud, forgery, identity theft, financial elder abuse, embezzlement, and other criminal investigations.  In addition, my law enforcement experience includes conducting physical surveillance, and interviewing witnesses, victims, and suspects. Further, my law enforcement experience includes writing affidavits and serving search and arrest warrants, analyzing financial records, and the collecting and processing of evidence.  Through my training and experience as a law enforcement officer, I have become familiar with fraud and embezzlement related crimes.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.   This affidavit is made in support of an application for warrants to search the residence of Ana Cristina TABAREZ ("TABAREZ") and Abraham Gerardo Gonzalez SOTO ("SOTO"), located at 40300 Washington Street, Apartment #106, Building Q, Bermuda Dunes, California 92203 (the "SUBJECT PREMISES"), as described further in Attachment A-1; TABAREZ's vehicle, a black 2018 Toyota RAV 4 sports utility vehicle with California License Plate Number 8CYV170, vehicle identification number 2T3ZFREV4JW424860 (the "SUBJECT VEHICLE"), as described further in Attachment A-2; and the persons of TABAREZ and SOTO, as described further in Attachment A-3 and A-4, respectively, to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud); Title

18, United States Code, Section 1344 (Bank Fraud); and Title 18, United States Code, Section 1028A (Aggravated Identity Theft) (collectively, the "SUBJECT OFFENSES").  The list of items to be seized is set forth in Attachment B to the search warrant application.  Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not purport to set forth all my knowledge of, or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On November 17, 2020, I was assigned to the RCSD's Special Investigations Bureau as a part of the FBI's Desert Cities Safe Streets Task Force.  That same day, I was contacted by Riverside County Sheriff's Deputy Robert Kelly ("DEPUTY KELLY") regarding a fraud investigation involving a bank employee.  DEPUTY KELLY reported to me that former Chase Bank teller Ana Cristina TABAREZ was suspected of embezzlement, elder financial exploitation, unauthorized account takeover, identity theft, forgery, and misuse of her position.  DEPUTY KELLY reported from February 15, 2020, through July 27, 2020, TABAREZ

conspired with three other co-conspirators to withdraw a total of $75,950.00 from three Chase bank customers' accounts.

8.   As a Chase Bank teller, TABAREZ had access to customers' accounts.  TABAREZ would access the Chase Bank Account Computer System and withdraw money in the form of cash from the unknowing customers' bank accounts.  TABAREZ took cash out of bank teller drawers and used forged withdrawal slips to reconcile the customers' accounts in the bank's computer system. TABAREZ would then pass the cash to unidentified accomplices who came to TABAREZ's teller window.  Unidentified male and female co-conspirators would present TABAREZ with a fictitious identification and stage over-the-counter transactions.  Then, the co-conspirators would depart the bank.  TABAREZ and at least three co-conspirators conducted these fraudulent account withdrawals on three Chase Bank accounts from February 15, 2020, through July 27, 2020.

9.   An open source social media search of TABAREZ revealed a publicly viewable Facebook page for TABAREZ in which she claimed to be married to SOTO.  Law enforcement database checks resulted in a California Department of Motor Vehicles ("DMV") Driver's license ("DL") photo for SOTO.  Also located on TABAREZ's Facebook profile was a photo of a male resembling the DMV DL photo of SOTO.  Physical surveillance at 40300 Washington Street, Bermuda Dunes, California, where the SUBJECT PREMISES is located, resulted in the observation of a male subject resembling the DMV DL photo of SOTO.

10.  As set forth below, investigators believe that one of TABAREZ's unidentified male co-conspirators is SOTO.  Chase Bank surveillance photos revealed a male subject of medium dark complexion with short black hair and wearing dark-rimmed eyeglasses.  The male subject from the surveillance photos resembles a Facebook profile photograph for SOTO, in which photos show SOTO to have similar physical characteristics as the male subject in the surveillance photos.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Riverside County Sheriff's Investigation

11.  On November 17, 2020, I met with Riverside County Sheriff's DEPUTY KELLY regarding a fraud investigation involving a bank employee.  During the meeting, DEPUTY KELLY described a fraud investigation regarding the Chase bank branch located at 36101 Bob Hope Drive, Rancho Mirage, California, in which bank associate TABAREZ is believed to have stolen $75,950.00 from three bank customers' accounts.

12.  On January 25, 2021, I reviewed DEPUTY KELLY's report #S201980048 on the TABAREZ bank fraud investigation.  As detailed below, DEPUTY KELLY's report contained references to specific Chase Bank records showing the fraudulent transactions conducted by TABAREZ using the accounts of elderly bank customers.  The report also contained summaries of interviews DEPUTY KELLY conducted with various witnesses.  It also included a summary of the interview of TABAREZ conducted by a Chase Bank investigator.  After reading DEPUTY KELLY's report, I learned the following about the commencement of the investigation:

a.    On August 12, 2020, DEPUTY KELLY was assigned to the RCSD's special enforcement detail in the City of Rancho Mirage in Riverside County.  DEPUTY KELLY took over the investigation of the fraud incident that was initially reported to Riverside County Sheriff's Patrol Deputy Brandon Amato ("DEPUTY AMATO").

b.    DEPUTY KELLY's report referenced DEPUTY AMATO's initial report from July 16, 2020, in which DEPUTY AMATO took a fraud report from Jacqueline Comras ("COMRAS"), date of birth September 14, 1932.  COMRAS reported that she had received a telephone call from the Chase Bank Fraud Department due to suspected fraudulent activity in her Chase Bank Account XXXXXX8699 ("8699").  COMRAS reviewed her account and learned that $24,550.00 was deducted from her bank account without her knowledge or permission.  The questioned withdrawals occurred in five separate transactions from April 18, 2020, through June 6, 2020.  COMRAS was informed by Chase Bank that the cash withdrawal slips that corresponded with the questioned transactions had COMRAS's name spelled wrong and bore a signature that did not appear to match the signature COMRAS had on file with the bank.

c.    I further read DEPUTY KELLY's report and learned that on August 12, 2020, DEPUTY KELLY went to the Chase Bank branch located at 36101 Bob Hope Drive, Rancho Mirage, and spoke with the branch manager identified as Bea Kroker ("KROKER").  KROKER told DEPUTY KELLY that COMRAS's questioned transactions occurred at the branch and were believed to have been committed

- 6 -

by a bank employee whose employment had since been terminated. KROKER then referred DEPUTY KELLY to the Chase Bank Investigations Unit.  KROKER did not provide DEPUTY KELLY with the name of the employee suspected of the fraudulent activity.

**B.    Search Warrant Obtained by DEPUTY KELLY**

13.   I read DEPUTY KELLY's report and learned that DEPUTY KELLY authored and obtained a search warrant issued by the Honorable Mac R. Fisher, Riverside County Superior Court, Case No. IN090920204, for TABAREZ's employee records, surveillance video of the questioned transactions, and transaction records.

14.   On September 9, 2020, DEPUTY KELLY served the search warrant to Chase Branch Manager Jean Rodriguez at 36101 Bob Hope Drive in Rancho Mirage, California.  According to DEPUTY KELLY's report, DEPUTY KELLY received the following items from Chase Bank in response to the search warrant:

        a.   a spreadsheet of the questioned transactions,

        b.   copies of the forged deposit slips that corresponded to the questioned transactions, and

        c.   a copy of the statement written by TABAREZ regarding the incident.

15.   According to DEPUTY KELLY's report, DEPUTY KELLY also received eight still photographs from the bank surveillance camera system of some of the questioned transactions.  Security camera videos and still photographs of all the questioned transactions were not provided by Chase Bank.

**C.   Additional Victims Identified From Search Warrant
Returns and Additional Investigation**

16.   A review of the Chase Bank search warrant returns
revealed the identities of two additional victims, Ellison
Grayson ("GRAYSON"), date of birth September 17, 1928, and
Margot Serrano ("SERRANO"), date of birth February 12, 1930.
DEPUTY KELLY learned both GRAYSON's and SERRANO's Chase Bank
accounts had been fraudulently accessed by TABAREZ.  GRAYSON's
#XXXXXX0404 ("0404") account had seven fraudulent transactions
drawn from February 22, 2020, through June 27, 2020, for a total
of $45,500.00.  DEPUTY KELLY learned that on February 15 and
February 22, 2020, two fraudulent transactions were drawn
against SERRANO's account #XXXXX5962 ("5962").  The two
transactions totaled $5,900.00.

17.   I read DEPUTY KELLY's report and learned that on July
3, 2020, GRAYSON's wife, Jean Grayson ("JEAN"), reported to the
Riverside County Sheriff's Department that she jointly holds
GRAYSON's Chase Bank account.  JEAN reported that she had not
given anyone permission to access the account, and that GRAYSON
suffered from Alzheimer's Disease.

18.   Included in the Chase Bank search warrant returns was
a written statement from TABAREZ.  On December 16, 2020, I read
a copy of TABARAZ's statement provided to me by DEPUTY KELLY and
discovered that the statement was a handwritten document dated
July 11 but without a year.  The document also bore the name
"Ana C. TABAREZ."  The following is a summary of the statement:

a.   TABAREZ, while working as a bank teller, made transactions with three different Chase Bank customers, on dates that she did not remember.

b.   A female subject in her mid-forties with long hair and a short stature came to the bank with another unidentified male subject.  The female subject assisted the male subject with completing his transaction.

c.   A few days later, TABAREZ walked to a nearby grocery store on her lunch break.  TABAREZ was contacted by the same unidentified female subject.  The female subject told TABAREZ she knew where TABAREZ's mom lived and that whenever TABAREZ saw the female subject, TABAREZ should do as she said to steal money.

d.   The unidentified female subject also instructed TABAREZ to be on the lookout for others.  She would know when to do the transactions when these other unidentified subjects came to the bank.  TABAREZ would wait until she was available to help those unidentified subjects once they entered the bank.

e.   TABAREZ denied having any communication with those subjects outside of the contact during the transactions within the bank.  TABAREZ also denied keeping any of the money that was stolen during the transactions.  TABAREZ claimed she was frightened when she completed the transactions with the unidentified subjects.

**D.   Chase Bank Investigation**

19.   I continued to read DEPUTY KELLY's report and learned that on August 13, 2020, DEPUTY KELLY spoke to Chase Bank

Investigator Charles REBSTOCK ("REBSTOCK") on the telephone. REBSTOCK was assigned to conduct an internal investigation of the suspected fraudulent activity affecting COMRAS's bank account.  REBSTOCK identified former Chase Bank Employee Ana Cristina TABAREZ as the person Chase Bank suspected of stealing from COMRAS's bank account.  TABAREZ was terminated on July 25, 2020, for suspected embezzlement, elder financial exploitation, account take over, identity theft, forgery, and misuse of her position.

20.  Additionally, I learned from DEPUTY KELLY's report that REBSTOCK told DEPUTY KELLY that TABAREZ had been employed by Chase bank from July 15, 2019, through July 25, 2020.  While TABAREZ was employed as a bank teller, she accepted forged bank withdrawal slips signed by co-conspirators to withdraw money from three victim customers' bank accounts.  TABAREZ would access the Chase Bank Account Computer System and withdraw money in the form of cash from the unknowing customers' bank accounts. TABAREZ took the cash out of the bank teller drawer and used the forged withdrawal slips as a reason to withdraw funds from the customers' accounts in the bank's computer system.  TABAREZ would then pass the cash to unidentified accomplices who came to TABAREZ's teller window.  The unidentified accomplices would present TABAREZ with a fictitious identification and stage an over-the-counter transaction.  REBSTOCK told DEPUTY KELLY that in each of the questioned transactions, TABAREZ's unique employee operator number, R666559, was used to complete the transaction in the Chase Bank computer system.

21.  I read DEPUTY KELLY's report and learned that from February 15, 2020, through July 27, 2020, a total of $75,950.00 was withdrawn from three victim bank customers' accounts by TABAREZ.  During the time period of the questioned transactions, TABAREZ was employed as an associate banker at the Rancho Mirage branch, located at 36101 Bob Hope Drive, Rancho Mirage, California.  During the same time, Chase Data Security Investigations identified TABAREZ as conducting thirteen questionable over-the-counter withdrawals from multiple accounts held by elderly customers.  The $75,950.00 worth of questioned transactions were withdrawn from three accounts held by elderly customers.  Bank security camera video revealed three unidentified subjects, one male and two females, assisted TABAREZ with the questioned transactions by posing as legitimate bank customers and staging the over-the-counter transactions. The true account holders' signatures were forged on the withdrawal slips to complete the transactions.  The unknown suspects accessed victim customers' accounts with the help of TABAREZ when they entered the branch and presented information impersonating the true account holders when conducting the questioned withdrawal transactions.

### E.   Interview of TABAREZ by REBSTOCK

22.  I further read DEPUTY KELLY's report and learned that on July 11, 2020, TABAREZ was interviewed on the telephone by REBSTOCK.  During the interview, TABAREZ admitted to the following:

a.   TABAREZ processed multiple unauthorized over-the-counter withdrawals from customers' accounts.  TABAREZ claimed she was compelled to do so through threats of harm.

b.   TABAREZ told REBSTOCK she was approached by an unknown female while not at work.  The unknown female told TABAREZ to provide cash to the unknown female and her other accomplices.  The unknown female told TABAREZ she would recognize the other suspects, both male and female, through their presentation of an identical identification card.

c.   TABAREZ admitted to selecting the customer accounts without any assistance or direction from the suspects, yet claimed she was too scared to report the activities.

d.   TABAREZ provided a written statement at the conclusion of the interview and was later terminated on July 25, 2020.

F.   **FBI Investigation**

23.   On or about December 16, 2020, I reviewed the surveillance photographs of TABAREZ while she was employed as a Chase Bank teller at the branch at 36101 Bob Hope Drive, Rancho Mirage.  I saw the following photographs of TABAREZ working at a bank teller window.

24.   There were two photographs dated June 6, 2020.

a.   One photograph was at 2:25 p.m.  This photograph depicted TABAREZ seated at the teller counter dressed in black pants, a black long sleeve shirt, and pink face mask.  TABAREZ was assisting an unidentified male subject who was standing on the opposite side of the teller counter.  The male subject was

dressed in a gray short sleeve shirt with "Adidas" printed in white letters across the front of the shirt, a gray baseball style cap with a gold-yellow crest logo on the front, and a blue and white patterned face mask.

      b.  I reviewed the other photograph, also dated June 6, 2020, at 2:21 p.m., which further depicted the male subject as having medium dark complexion with short black hair.  The male subject wore dark-rimmed eyeglasses and a gold ring on the ring finger of his right hand.

      c.  These two photographs were taken on the same day $7,000.00 was withdrawn from COMRAS's account at 2:24 p.m., and $7,000.00 was withdrawn from GRAYSON's account at 2:22 p.m.[1]

    25.  I also reviewed a photograph of TABAREZ dated June 27, 2020, at 12:10 p.m.  TABAREZ was standing at the teller counter dressed in black pants, a black shirt, a light gray long sweater, and a black face mask.  No one was standing at the opposite side of the teller counter at the time of this photograph.  On the workstation counter, a mobile telephone was face up with the screen illuminated and TABAREZ was looking in the direction of the mobile telephone.  This photograph was from

---

[1]    I believe the source data for the times associated with the transactions referenced in this affidavit are times that, based on my training and experience, corresponded to Eastern Standard or Daylight Savings Time in the United States-- three hours ahead of Pacific Standard or Daylight Savings Time. But as of the time of the submission of this affidavit, REBSTOCK, who provided the source data, has not been able to confirm this definitively.  I deducted three hours from the listed time in the source data associated with the times of the transactions to provide this affidavit.

the same day $9,000.00 was withdrawn from GRAYSON's account at 1:02 p.m.

26.   In addition, there were surveillance photographs of unidentified co-conspirators who came to TABAREZ's teller window on various days of the questioned transactions.

a.   I reviewed a photograph dated April 18, 2020, at 9:43 a.m., which depicted an unidentified white female subject at TABAREZ's teller window.  The female subject was wearing a floral print top, black face mask, and disposable gloves.  The female subject had a distinct blonde puffy hairstyle.  On the teller counter in front of the female subject was an identification card and bill fold.  This photograph was from the same day $6,000.00 was withdrawn from COMRAS's account at 9:43 a.m.

b.   I reviewed a photograph dated April 18, 2020, at 10:58 a.m., which depicted an individual at TABAREZ's teller window who appeared to be the same male subject in the bank at TABAREZ's teller window on June 27, 2020, at 1:01 p.m.  The male subject was dressed in a white, short sleeve t-shirt with brown stripes, black pants, a blue baseball style cap, and a white face mask.  The male subject was of medium complexion with short black hair and wore dark-rimmed eyeglasses.  This photograph was from the same day $6,000.00 was withdrawn from GRAYSON's account at 11:00 a.m.  The male subject appeared to be the same male subject also depicted in the photographs dated June 6, 2020, at 2:21 p.m.

c.    I reviewed a photograph dated April 18, 2020, at 11:54 a.m., which depicted an unidentified female subject approaching TABAREZ's teller window.  The female subject had medium complexion with dark hair.  The female subject was dressed in a black short sleeve t-shirt, blue jeans, a black cap and white and black sneakers.  The female subject was also wearing a white face mask, disposable gloves, with black large lens sunglasses on her head and carrying a gray handbag.  This photograph was from the same day $5,000.00 was withdrawn from COMRAS's account at 11:55 a.m.

d.    I reviewed a photograph dated April 25, 2020, at 11:34 a.m., which depicted an unidentified female subject at TABAREZ's teller window.  The female subject had medium complexion with dark hair.  The female subject was dressed in a black short sleeve V-neck shirt and wearing a white baseball style cap with a light-colored triangular logo.  The female subject was also wearing a white face mask, disposable gloves, and black large lens sunglasses.  A gray strap of a handbag was over her shoulder.  On the counter in front of the female subject was an identification card and a mobile telephone with the screen illuminated.  The female subject appeared to be the same female subject also depicted in the photograph dated April 18, 2020, at 11:54 a.m.  This photograph was from the same day $6,550.00 was withdrawn from COMRAS's account at 11:35 a.m.

e.    I reviewed a photograph dated June 27, 2020, at 1:01 p.m., which depicted an unidentified male subject who was standing on the opposite side of TABAREZ's teller counter.  The

- 15 -

male subject was dressed in a gray short sleeve shirt with
"Adidas" printed in white letters across the front of the shirt
and wearing a red face mask.  The male subject had medium
complexion with short black hair and wore dark-rimmed
eyeglasses.  This photograph was from the same day $9,000.00 was
withdrawn from GRAYSON's account at 1:02 p.m.  The male subject
appeared to be the same male subject also depicted in the
photograph dated June 6, 2020, at 2:21 p.m.

      **G.**    **Gerardo Abraham Gonzalez SOTO**

    27.  On or about December 16, 2020, I conducted an open
source social media search of TABAREZ.  I located a publicly
viewable Facebook page bearing the screen name "AnaCristina T.
Rico."  I recognized the profile photograph and other
photographs on the page as TABAREZ from her California Driver's
License photograph.  The Facebook page also listed "Gerardo
Abraham" as her husband.  I searched the Facebook page bearing
the screen name "Gerardo Abraham."  I saw the profile photograph
and other photographs depicted a male subject with medium dark
complexion and short black hair.  In some of the photographs the
subject was wearing dark-rimmed eyeglasses.  According to the
Facebook page, the subject worked in the heating and air
condition trade.  I conducted a records search through law
enforcement resources and located SOTO.  SOTO had the
residential address, 74401 Hovley Lane East Apartment 1818, Palm
Desert, California, listed in his driver's license record.  Also
listed in SOTO's driver's license record was a traffic citation
issued on April 10, 2019.  The vehicle SOTO was in when issued

- 16 -

the citation bore the California License Plate 8CYV170 (i.e.,
the SUBJECT VEHICLE).

28.   I conducted a record search of license plate 8CYV170
through the automated license photograph reader (LPR) database.
Between July 2019 and November 2019, there were five reads of
the 2018 Toyota license plate in the parking lot of the
apartment complex located at 74401 Hovley Lane East Apartment
1818, Palm Desert, California.  This apartment complex was also
an address listed on SOTO driver's license record.

29.   Additionally, I located two LPR hits of the 2018
Toyota license plate 8CYV170 in the parking lot of an apartment
complex located at 40300 Washington Street, Bermuda Dunes,
California (where the SUBJECT PREMISES is located).

H.       **SUBJECT PREMISES Identified**

30.   On December 17, 2020, I observed the parking lot of
the apartment complex located at the SUBJECT PREMISES.  I
located the black 2018 Toyota RAV 4 SUV with license plate
8CYV170 (i.e., the SUBJECT VEHICLE).

31.   On January 5, 2021, I observed the parking lot of the
apartment complex where the SUBJECT PREMISES is located.  At
approximately 7:23 a.m., I saw a male subject I recognized as
SOTO.  I observed SOTO walk into Apartment #106, of Building Q.
At approximately 7:53 a.m., I saw SOTO exit the corridor to
Apartment #106 and walk to a white Ford truck with a service bed
marked "PB Mechanical Air Services."  SOTO then drove away in
the truck.  At approximately 8:40 a.m., I observed TABAREZ exit
the corridor for Apartment #106 and walk to the SUBJECT VEHICLE.

TABAREZ was carrying a mobile telephone in her hand.  TABAREZ entered the SUBJECT VEHICLE and drove away.

**I.        Trash Cover Operation**

32.  On January 20, 2021, at approximately 8:31 a.m., Special Agent Michael Morgan (SA Morgan) and Special Agent Krista Gonzalez (SA Gonzalez) conducted a trash cover operation at the SUBJECT PREMISES collecting the trash from the dumpster located across from Building Q.  As a result of the trash collected, SA Morgan located a discarded paystub from PB Mechanical Air Services Corp.  The discarded paystub contained the name "Gerardo Gonzalez Soto."  The address listed on the paystub was 41910 Boardwalk A11, Palm Desert, California 92211, the address of PB Mechanical Air Services.

**J.   Summary of Evidence Expected to Be Found in the SUBJECT PREMISES**

33.  Based on my training, experience in previous fraud investigations, and training and experience of other law enforcement officers with whom I have had discussions, and given the nature of the crimes believed to be committed by TABAREZ and SOTO, I believe the SUBJECT PREMISES would still contain the following types of evidence:  clothes worn by TABAREZ and SOTO and any other co-conspirator who might be a resident in the SUBJECT PREMISES; bank records of TABAREZ and SOTO; records regarding stolen cash; records of purchases from stolen cash; records of cell phone communications between TABAREZ, SOTO, and other co-conspirators during the period of the SUBJECT OFFENSES; employment records; safe(s) and/or lockbox(es) containing stolen

cash; information regarding storage of stolen cash in other
locations; key(s) to or evidence of safe deposit box(es) with a
bank in which to store stolen cash; records of purchases made
with stolen cash; and records showing other financial activities
with stolen cash.

## V.   <u>TRAINING AND EXPERIENCE IN FINANCIAL CRIMES</u>

### A.   Documents

34.  Based on my training, experience, previous fraud
investigations and the experience, and training of other law
enforcement officers with whom I have had discussions, I
recognized the nature of the questioned transactions as
consistent with embezzlement and financial elder abuse
facilitated through forgery and identity theft.  I know suspects
who commit fraud related crimes tend to keep notes of victim's
personal identifying information, account statements and
receipts in their homes and vehicles.  I know that criminals who
use false identification or identify theft to commit fraud
crimes will tend to keep the material needed to produce false
identification and identifying documents of their victims in
their homes and vehicles.

35.  Additionally, the production of false identification
and identifying documents is commonly aided through computer
technology, including photograph editing software, check
printing software and image libraries commonly found on home
computers, notebook computers and other personal electronic
devices.  Home computers, notebook computers and other personal
electronic devices are commonly found in the suspect's home and

vehicle.  Finally, in fraud crimes involving forgery, I know suspects tend to practice forging a victim's signature before committing the crime.  These practice forgeries can be found on scrap pieces of paper, note pads or other papers.  Papers containing practice forgeries tend to be found in the suspects' homes and vehicles.  I know these items to be of evidentiary value in showing a suspect committed a fraud crime and the methods by with the crime was committed.

       **B.**        **Case Currency**

    36.  Based on my training, experience, previous fraud investigations and the experience, and training of other law enforcement officers with whom I have had discussions, fraud crimes involving cash currency transactions, such as in this case, can be difficult to track where stolen monies were secreted and how they were used as there are few records after the monies were stolen.  However, in my experience I know that suspects steal money and defraud victims in order to enrich themselves and enjoy the benefits of such undue enrichment. Suspects tend to keep stolen money close at hand so they may use it at will.  Commonly, suspects tend to hide stolen monies in their homes and vehicles.

    37.  Additionally, the purchasing of consumer goods, services and experiences generates records of these transactions in the form of receipts, extended warranties, product packaging, airline tickets, travel itineraries, hotel bookings and computer printouts.  Commonly, these records tend to be found in the suspect's home and vehicles.  Such records tend to be of

evidentiary value and develop further investigative leads.  Such records are known to me to be of evidentiary value in showing a suspect committed a fraud crime and to account for the stolen monies.

**C.        Clothing**

38.  Based on my training, experience, previous fraud investigations and the experience and training of other law enforcement officers with whom I have had discussions, I know fraud crimes occurring in a bank branches are commonly recorded with security camera systems as security camera equipment inside banks is a common industry-wide practice.  Even in cases where the suspects have taken steps to conceal their identities with hats, sunglasses, and face masks, valuable information can still be gleaned from the security camera videos.

39.  In this case TABAREZ and her co-conspirators wore articles of clothing that were of a particular style, bore identifiable designs or a brand name.  Even plain clothing can be used to further identify a suspect or place a suspect at the scene of a crime.  Plain clothing items coupled together to form outfits become less common and can be matched to outfits worn by suspects during the commission of a crime.  I know suspects of fraud crimes tend to keep the clothing they wore during the commission of a crime because of the false belief that the clothing is not evidence.  I know that suspects tend to keep their clothing, including clothing worn during the commission of a crime, in their homes and vehicles.

D.          **Computer and Digital Devices**

40.  In today's technological society mobile telephones are ubiquitous.  Based on my training, experience, previous fraud investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know mobile telephones are carried by suspects who commit all types of crimes.  In some cases, a suspect's mobile telephone is kept for personal use, and is only incidentally used to facilitate criminal activity.  In other cases, mobile telephones are kept by suspects for the primary use of facilitating criminal activity.  In either case, I know mobile telephones to be valuable containers of evidence.

41.  Suspects use mobile telephones to send and receive messages, telephone calls, videos and photographs to communicate with one another about their crimes.  During this investigation it was learned that TABAREZ and three co-conspirators carried out a coordinated account take over scheme through a series of thirteen over-the-counter transactions.  The scheme was only successful if TABAREZ was available to assist the co-conspirator at the teller window.  It would be difficult to ensure that a co-conspirator would be able to meet with TABAREZ at her teller window by merely waiting in line at the bank.  In two of the surveillance photographs from this investigation TABAREZ and a female co-conspirator had mobile telephones at hand with illuminated screens during two separate transactions.  Additionally, I know that suspects tend to keep their mobile telephones in their homes, vehicles and on their person.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

42.    Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

43.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

44.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant:  depress TABAREZ's and/or SOTO's thumb- and/or fingers on the device(s); and hold the device(s) in front of TABAREZ's and/or SOTO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

45.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VII. <u>CONCLUSION</u>

46.  For the reasons described above, I respectively submit there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, will be found at the SUBJECT PREMISES, in the SUBJECT VEHICLE, and on the persons of TABAREZ and SOTO, as described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of March 2021.

_____
UNITED STATES MAGISTRATE JUDGE

<u>**ATTACHMENT A-2**</u>

<u>**DESCRIPTION OF THE SUBJECT VEHICLE TO BE SEARCHED**</u>

The vehicle to be searched is a black 2018 Toyota RAV 4 sports utility vehicle with California License Plate Number 8CYV170, vehicle identification number 2T3ZFREV4JW424860 (the "SUBJECT VEHICLE").  The SUBJECT VEHICLE is registered to Adriana Rico at 81149 Palmwood Drive, Indio, California 92201. The lienholder of the SUBJECT VEHICLE is Toyota Motor Credit Corp., P.O. Box 105386, Atlanta, Georgia 30348.

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1344 (Bank Fraud); and Title 18, United States Code, Section 1028A (Aggravated Identity Theft) (collectively, the "SUBJECT OFFENSES"), namely:

a.    Documents reflecting ownership and/or control of the SUBJECT PREMISES and the SUBJECT VEHICLE.

b.    Documents reflecting the identities of TABAREZ and SOTO, limited to 15 items per location.

c.    All papers or notes bearing the names or personal identifying information of victims JACQUELINE COMRAS, ELLISON GRAYSON, and MARGOT SERRANO.

d.    Documents reflecting the potential use of proceeds from the SUBJECT OFFENSES, including bank records, accounting records, real estate records, and other financial records to include tax records, items indicating travel to include passport, airline receipts, and border crossing documents, dated after February 15, 2020.

e.    Records containing, concerning, or constituting bank statements, credit card statements, checks, deposit slips, check registers, applications, and financial documents of TABAREZ or SOTO, dated after February 15, 2020.

- 2 -

      f.   All forgeries or practice forgeries of the signatures of victims JACQUELINE COMRAS, ELLISON GRAYSON, and MARGOT SERRANO.

      g.   All financial account statements, ledgers or transaction receipts that show cash transactions over $500 from February 15, 2020, through July 30, 2020.

      h.   All electronic financial transaction records such as PayPal, Zelle, or Cash App. that show cash transactions over $500 from February 15, 2020, through July 30, 2020.

      i.   Records relating to the acquisition, secreting, transfer, concealment, and/or expenditure of money.

      j.   Quantities of cash over $500, bulk cash, Chase Bank cash bands, or Chase Bank cash envelopes.

      k.   Chase Bank completed or blank withdraw slips.

      l.   Fictitious identification material, including the personal identifying information of parties who are not TABAREZ or SOTO, fictitious identification cards, identification card templates, or computer printouts of draft fictitious identification.

      m.   Clothing potentially worn by TABAREZ on June 6, 2020, to include black pants, black long sleeve shirt, and pink face mask.

      n.   Clothing potentially worn by TABAREZ on June 27, 2020, to include black pants, black shirt, light grey long sweater, and black face mask.

      o.   Clothing potentially worn by the male subject presumed to be SOTO on April 18, 2020, to include a white short

sleeve tee shirt with brown strips, black pants, blue baseball style cap, and a white face mask.

p.   Clothing potentially worn by the male subject presumed to be SOTO on June 6, 2020, to include a grey short sleeve shirt with "Adidas" printed in white letters across the front of the shirt; a gray baseball style cap with a gold-yellow crest logo on the front, a blue and white patterned face mask, and dark rimmed eyeglasses.

q.   Clothing potentially worn by the male subject presumed to be SOTO on June 27, 2020, to include a grey short sleeve shirt with "Adidas" printed in white letters across the front of the shirt and a red face mask.

r.   Mobile telephone or telephones determined to belong to or be in the possession or control TABAREZ. Ownership, possession or control of the mobile telephones being reasonably shown by profession of ownership, physical personal possession, immediate proximity, or storage within other personal property (e.g., purse or bag) or location in or among other personal belongings, or readily at hand in a vehicle.

s.   Mobile telephone or telephones determined to belong to or be in the possession or control SOTO.  Ownership, possession or control of the mobile telephones being reasonably shown by profession of ownership, physical personal possession, immediate proximity, or storage within other personal property (e.g., purse or bag) or location in or among other personal belongings, or readily at hand in a vehicle.

    t. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations between February 15, 2020 and July 30, 2020.

    u. Contents of any calendar or date book.

    v. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

    w. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

     i. Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

     ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     iii. evidence of the attachment of other devices;

     iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

     v. evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

- 7 -

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to:  depress TABAREZ's and/or SOTO's thumbs- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which

specific finger(s) and/or thumb(s) shall be depressed; and  hold the device in front of TABAREZ's and/or SOTO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.